Moore v. Pierson et al.

MOORE *v.* PIERSON·*et al.*

| 6 | 279 |
| 79 | 509 |

| 6 | 279 |
| 92 | 721 |

| 6 | 279 |
| 102 | 421 |

| 6 | 279 |
| 123 | 649 |

| 6 | 279 |
| 132 | 660 |
| 133 | 358 |

Where a negotiation is carried on between parties residing at a distance from each other, by letter, the contract is complete, when the answer containing the acceptance of a distinct proposition, is dispatched by mail or otherwise, provided it be done with due diligence after the receipt of the letter containing the proposal, and before any intimation is received that the offer is withdrawn.

As soon as an offer by letter is accepted, the consent is given, and the contract is completed, provided the party making the offer was alive when the offer was so accepted.

While it is true, that there can be no contract, without the consent of all the parties to it, it is not necessary that their wills should concur at the same instant, if the will of the party receiving the proposition, is declared before the will of the party making it is revoked.

While the consent of one party may precede the other, yet the will of the party offering, must continue down to the time of the acceptance by the other party ; and the presumption is, unless the contrary appears, that the will of the party making the proposition, does so continue.

Where on the 25th of November, 1854, M., who resided in Iowa, made an offer by letter, to P., who resided in California, for the purchase of his farm, who, on the 30th of March, 1855, replied, declining the proposition of M., and making a new proposition ; and where M., on the 23d of May, 1855, again wrote to P., accepting the proposition made by him ; *Held,* That the contract was complete from the moment that M. wrote the letter of the 23d of May, and deposited it in the post office.

Moore v. Pierson et al.

As between the parties, a conveyance of real estate by a parent to a child, will be upheld, as being founded upon a meritorious consideration.

Where an agreement between parent and child for the conveyance of real estate, is executory, exists in parol, and is unassisted by the fact of possession and permanent improvements, taken and made upon the faith of such promise, courts of equity will not aid the donee, by decreeing a specific performance of the agreement.

Where the promise of the parent to convey real estate to the child, is clearly, definitely and conclusively established, and where the child, upon the faith of it, has entered into possession, and made valuable and permanent improvements upon the land, the parent will be decreed to specifically perform the agreement.

In such cases, it will not avail the donee, if his improvements are temporary, of but little value, or simply for his convenience, as an occupying tenant. They must be of a permanent character—such as clearly show, that he regards and designs to treat the land as his own, and relies upon the promise of the father.

Where a defect in a bill in equity is one of form merely, or where the case stated in the bill is such that the court can properly proceed to a decree, the insufficiency of the bill cannot, for the first time, be raised on appeal. *Aliter*, where the bill shows a want of equity.

The purchaser of real estate, in the possession of a third person, is bound to take notice of such person's title to the possession, whether his title be legal or equitable.

The possession of real estate is sufficient to put a purchaser upon inquiry, and amounts to constructive notice of the title under which it is held.

J. P. had a number of sons, and had helped all of them, either by giving them land, or means with which to enter the same, or start in business. One of the sons, L., (a twin brother of A.), died in 1843 or 1844, being unmarried, and leaving no issue. L., at the time of his death, was in the possession of eighty acres of land, and held the title, either legal or equitable, as also another tract of land. Whether the legal title was in the father, and the equity in the son, or whether the father's legal right accrued upon the death of L., and as his heir at law, did not satisfactorily appear. The improvements upon the eighty acres, at the time of the death of L., were put there by him, and there was nothing to show that the father had ever expended a dollar upon the land. On his death-bed, L. desired that his father should see that his interest in this eighty should be given to A., and this desire the father promised should be carried out. His other land, L. desired should be given to his brother J. After his brother's death, A. took possession, and made large improvements upon the eighty acre tract, consisting of fencing, and a barn, at an expense of some $1,000, or $1,200. During all this time, the father resided near the premises, and had full knowledge of the possession and improvements. On two

or three occasions he expressed his intention to carry out the will of L., in relation to the eighty, and he uniformly spoke of it as A.'s. A. continued in possession, and enjoyed the rents and profits, to the time of his leaving for California, and after that, it was occupied by his tenants—this possession covering a period of some twelve or fourteen years. In 1854, by correspondence, A. sold the eighty acre tract, with other lands, to M. While M. was negotiating with A. knowing that the legal title was in the father, he called upon him, and obtained his promise to make the deed. Subsequent to this, the father spoke to other persons of M.'s trade with A., and stated that he was glad that M. was to get the place, and that he had agreed to help him make the payments. On bill filed by M. against the father, to compel a specific performance of the promise to make a deed; *Held*, That J. P. should be required to make the deed to M.

*Appeal from the DesMoines District Court.*

TUESDAY, JUNE 22.

IN CHANCERY. Petition prays the specific performance of a contract in relation to certain real estate. Abner Pierson is charged with holding the legal title to one hundred and sixty acres of the land, and the equitable title to the other eighty—the legal title to that, being in the respondent, John Pierson, the father of the said Abner. The other respondent, O. B. Matteson, claims to be a purchaser for a valuable consideration, without notice of the outstanding contract with complainant.

In 1854, Abner Pierson resided in California, and the complainant, his brother-in-law, in or near Burlington, in this State. In the autumn of that year, a correspondence was commenced between them, in relation to the sale of this land, which was continued until in May, 1855, and which, as complainant insists, resulted in a contract by which he purchased the same. This correspondence will be found in the opinion of the court. Prior to this time, Abner forwarded to Starr & Phelps, a power of attorney to mortgage or sell his lands. It proved to be defective, and on the 2d of January, 1855, they forwarded him another, with instructions as to the manner of executing and acknowledging the same. On the 11th of May, he exe-

cuted the power of attorney, but for some cause, the names of Starr & Phelps were erased, and that of Samuel Leibrick, the brother-in-law of said Abner, substituted.

On the 7th of June, 1855, John Pierson sold the entire land to O. B. Matteson, for $24,000, and executed a bond for a deed, to be made on or before the first of April, 1856. The power of attorney was received by Leibrick on the 12th of June, who, on the same day, made a deed as the attorney of Abner, to Matteson, for the quarter section, which he deposited with Thomas, of the banking house of Greene, Thomas and Company. This deed Matteson refused to accept, and it was then deposited with M. D. Browning, one of the attorneys of respondents. Leibrick, about the time of making the deed to Matteson, but whether before or afterwards is not clearly shown, received three or four thousand dollars from John Pierson. Pierson probably received it from Greene, Thomas & Co., as the bankers of Matteson, but of this there is no satisfactory evidence. On the 25th of May, 1855, Moore informed the tenants in possession of the premises under Abner, that he had purchased, and they acknowledged him as their landlord, and agreed to pay him rent. Most of the permanent improvements of the farm are on the eighty acres—the title to which is in John Pierson. These improvements were made by Abner, with his father's knowledge, and under assurance that he would convey it when required. Moore tendered the money due, and offered to fulfil his contract to Leibrick, soon after he got the power of attorney—perhaps the same day. For the other material facts, see the opinion of court. The respondents appeal.

*David Rorer*, with whom were *Browning & Tracey*, for the appellants.

I. Was there any contract actually consummated betwixt Moore and Abner Pierson ? This is at least doubtful. Moore exhibits a letter from Abner, dated 30th of

March, 1855, and claims to have accepted by letter the offer therein contained. He calls for the production of his letter of acceptance. It is produced, but is in answer to a letter from Abner of the 3d of April. This letter of the 3d of April, is not by Moore produced. The offer contained in it, is the one he claims to have accepted. This court has no means of knowing what that offer was. The letter given by Moore, in exhibit, does not correspond with the one stated in the bill. The bill alleges that the letter from Abner, was received about the first of June, 1855, and that on its receipt, he immediately wrote, accepting, and immediately procured the money to make the first payment; whereas, in another place, it states that he was ready with the money some days before the receipt of said letter, in anticipation that Abner would accept an offer previously made by said Moore. In this particular the bill is contradictory, as well as in relation to the date of the letter. A pleading thus contradictory looses much of its force. Such conflicting statements are evidence against complainant. 3 Greenl. on Evidence, section 273.

It is argued that the reference to the letter of the 3d of April, by Moore, in his letter to Abner, is a mistake; but of this there is no proof, nor does the bill lay the foundation for proof in that respect—such mistake is not charged in the bill. It is evident, then, that Moore never answered the letter of the 30th of March, but received from Abner a second letter, dated the 3d of April, as promised in the former one, particularizing certain payments to be made. This second letter Moore alone could produce. The conduct of a party in withholding evidence, exclusively within his power, raises a presumption in law, that if produced, it would militate against him. 1 Starkie on Evidence, 34, sec. 16; 1 Greenl. on Evidence, sec. 37.

The bill states that the letter of the 30th of March, was received by Moore about the first of June, and that he answered it as soon as received. The answer is to one dated the 3d of April, and bears date of the 23d of May. This, and the evidence of Mr. Phelps, clearly proves the receipt

of the letters of Abner Pierson, to have been long before the time alleged, and that the acceptance of the proposition was not promptly made, but was the result of an after-thought, growing out of the sudden rise of the property indicated by Matteson's purchase.

That a second letter was written by Abner, and received by Moore, we have every reason to believe. In the letter of the 30th of March, Abner says: "I would like the first payment made on the first of June next, and the accounts there against me, where there is no settlements to be made, paid up, which I will inform you in another." So the proposition was not complete, until the receipt of another letter should more definitely fix the terms. That such letter was written and received, and was dated the 3d of April, is clearly indicated. Why is it not produced by Moore? It is part and parcel of the contract. The fraudulent effort to pass it over, and accept the imperfect offer of the 30th of March, is detected by these circumstances. Moore was bound to accept promptly, and within all the terms. 1 Parsons on Cont., 404; *McCulloch* v. *Eagle Ins. Co.*, 1 Pick., 277; *Eliason* v. *Henshaw*, 4 Wheat., 225; *Holland* v. *Eyre*, 2 Simmons & Stuart, 184. Then Moore has not accepted within time, if at all. He has not only greatly delayed an answer, but into that answer introduced new terms. Under all the circumstances, it may well be doubted, if any contract was, in legal contemplation, ever consummated. Where there is doubts, equity will not enforce. *Carr* v. *Duval*, 14 Pet., 77; *Haddleston* v. *Brisloe*, 11 Ves., 522; *Holland* v. *Eyre*, 2 Simmons & Steuart, 194. To make a contract, both parties must mean the same thing, and in the same sense. 1 Parsons on Conts., 6.

II. The bill states an unconditional proposition, by the letter of the 30th of March. The letter shows a proposition to sell on terms stated, and to be stated in a subsequent letter, if the elder Pierson would convey the eighty. Complainant must establish the very case stated, and not

a different one.   *Green* v. *Storm*, 3 Sand. Ch., 305 ; *Carr* v. *Duval*, 14 Pet., 77 ; *Mundorff* v. *How.*, 4 Md., 316.

III.   Supposing a contract to have been consummated, is it such an one, in point of certainty, as equity will enforce ? and if so, is that contract so evidenced in writing, as that equity will decree its specific performance ?   The letters do not identify the premises.   The words "my farm," and like expressions, are used.   An agreement to be specifically enforced, must not only be certain in its terms, and as to the subject matter, but that certainty must appear from the written contract, or letters, or from some writing therein referred to, so as to be understood without the aid of parol testimony.   Willard's Equity, 267 ; *Kendall* v. *Almy et al.*, 2 Sumn., 295 ; *St. Johns* v. *Benedict*, 6 Johns. Ch., 11 ; *Graham* v. *Call*, 5 Mumf., 369 ; *Dalzell* v. *Crawford*, Parsons' Select Cases, 37 ; *Parish* v. *Koons*, Ib., 95 476 ; *Stoddard* v. *Tucker*, 5 Md., 18 ; *Shelton* v. *Church*, 18 Miss., 774 ; *Colson* v. *Thompson*, 2 Wheat., 336 ; 2 Leading Cases in Equity, 524 ; *Kay* v. *Curd*, 6 B. Monroe, 100.

The letters use no descriptive terms.   If it be said that Abner Pierson's letter refers to the agency of Starr & Phelps, the answer is, that the power of attorney they then had, as also the one to Leibrick, include only the quarter section.   The eighty acre tract is not mentioned in either. So far as to that eighty, the whole case rests in parol.   In parol, not only as betwixt Moore and Abner Pierson, but also, as betwixt John Pierson, Sen., and Abner Pierson, and of course as to Moore, who claims under Abner.   The bill alleges the legal title to the eighty, to be in said John Pierson, Sen., in trust for Abner, but does not state the particulars of the trust.   The evidence, however, shows it to rest in *parol*—a mere verbal promise to give it to Abner.   This brings us to the next proper division of our subject.

IV.   A parol gift of land, by father to son, will not be specifically enforced in equity ; even though accompanied by possession.   It will not be enforced against the father while

living, nor against his heirs at law, after his death. Nor in any case, nor as betwixt any persons, nor in favor of an assignee of such *promises*, however valuable a consideration may have been paid for such transfer. *Banks* v. *Mayo's heirs*, 3 A. K. Marsh., 435 ; *Pinckard* v. *Pinckard*, 23 Ala., 649 ; *Harder* v. *Harder*, 2 Sand. Ch., 17 ; *Darlington* v. *Cole*, 1 Leigh., 36 ; *Black* v. *Cord*, 2 Har. & Gill, 100. Such parol gift is not only within the statute of frauds, but is *voluntary* ; and equity will not enforce specific performance in favor of *volunteers*.

V. Equity will not enforce speculative contracts. Moore is attempting to speculate upon his superior means of knowledge, and upon Abner Pierson's ignorance of the rise of property pending the negotiation, and upon the confidence reposed by Abner in Moore, as a *brother-in-law*. *McKay* v. *Carington*, 2 McLean, 59 ; *Lockridge* v. *Foster*, 4 Scam., 573.

VI. The bill charges that John Pierson, Sr., advised Moore to make the purchase, but of this there is no proof. Moore states in his letter to Abner, that such is the fact, but that letter was called for by Moore, and is not legal evidence. Moreover, the testimony of Samuel Leibrick, that Moore denied having heard from Abner, until the Matteson purchase occurred, goes far to negative the idea that said Pierson so advised Moore, or that Moore ever mentioned the subject to him. It is apparent, from the whole case, that if Moore contemplated accepting at all, that fact was revealed to Starr & Phelps only, and was sedulously kept secret from not only Abner, but from his friends here, at least till the 23d of May, the date of Moore's letter to Abner. The great rise of the property, may have been motive enough for such concealment, until by a full power of attorney, such advantage could be firmly fixed. But such oral advice would not bind Pierson, if given. *Hawkins* v. *King*, 2 A. K. Marsh., 109.

VII. The agreement, to be enforced, must be mutually binding, so as to be reciprocal, and capable of being enforced by the adverse party. Now, could the elder Pierson have

forced Abner to receive the gift? To accept a deed as a mere gratuity? If not, then Abner could not enforce performance against him. Nor can Moore; for Abner could sell no greater rights to Moore, than he himself possessed. It does not matter that Moore was to pay Abner a consideration. The contract is still a voluntary one, as betwixt Abner and his father. Equity will not enforce it, because it is voluntary. Equity will not enforce it, because it is not mutual. And if equity will not so enforce it against John Pierson, Sen., much less will it enforce it against Matteson, who purchased of him, for a valuable consideration—a consideration, double the amount which Moore was to pay Abner. *Parker* v. *May*, 3 Marsh, 463; *Acker* v. *Phœnix*, 4 Paige, 305; *Mintum* v. *Seymour*, 4 Johns. Ch., 479; *Dawson* v. *Dawson*, Dev. Eq., 93; 1 Lead. Eq. Cases, 239; *Bebb* v. *Smith*, 1 Dana, 580; *Tiernan* v. *Poor*, 1 Gill & Johns., 217; *Duval* v. *Myers*, 2 Md. Ch. Dec., 401; Wilard's Equity, 263; *Benedict* v. *Lynch*, 1 Johns., Ch. 307; *German* v. *Machin*, 1 Paige, 288; *Banks* v. *Mayo's Heirs*, 3 A. K. Marsh, 435. In the latter case, the promise to give the land, was in writing, but being voluntary, equity refused to enforce it, in favor of a purchaser from the person to whom the promise was made, although such purchaser paid a large consideration.

VIII. By the same rule of mutuality, Moore cannot compel Abner to convey the quarter section alone, as Abner could not compel him to receive it without the eighty, which Abner has neither capacity nor power to convey. Equity will not enforce a contract by halves, nor of an imperfect title. *Hepburn* v. *Auld*, 5 Cr., 262.

IX. The possession of Moore will not avail him. If the contract was not, as to the elder Pierson, voluntary, yet it must clearly appear that Moore's entry into possession, was connected with, and referable to the contract, and that he took possession by the known permission of Abner. *Lord* v. *Underdonck*, 1 Sand., Ch., 46; *Given* v. *Colder*, 2 Desau., 171; *Thompson* v. *Scott*, 1 McCord Ch., 39; *Jervis* v. *Smith*, 1 Hoff. Ch., 470. It cannot be pretended

that the possession was by the consent of Abner, for the evidence shows that it was taken, after he united in a sale to Matteson.

X. It is not material whether Matteson had notice or not. He is a purchaser for value, contending against one claiming under a mere volunteer.

XI. If the bill was confessed, or not answered, by the elder Pierson, equity would not decree against him, as to the eighty acres, nor against those holding under him, under the evidence of this case, explaining the origin and nature (as it does) of the alleged trust. He was not bound to complete the gift by a conveyance. *Banks* v. *Mayo's Heirs*, 3 A. K. Marsh, 435.

XII. There is gross inadequacy of price, in reference to the time Moore attempted to close the contract. Eight months intervened during the treaty. The value, at the commencement of the negotiation, is not a fair test. Moore had all the advantages of knowledge, while the vendor was absent, and without means of knowledge of the intervening rise of property. That there was a rise of one hundred per cent., is shown by the price paid by Matteson. This, of itself, will cause equity to refrain from enforcing a performance. *Seymour* v. *Delany*, 6 Johns., Ch., 222; 3 Cow. S. C., 445; *Clicknel* v. *Oglevie*, 1 Deans., 250; *Power* v. *Hale*, 5 Foster (N. H.) 145; *Osgood* v. *Franklin*, 2 Johns. Ch., 24; *Osgood* v. *Franklin*, 14 Johns., S. C., 527; *Clark* v. *Railroad Co.*, 18 Barb., 350; 2 Story's Eq., sec. 769. To obtain a decree for performance, the price must be nearly adequate. *Lucas* v. *Barrett*, 1 G. Greene, 525.

XIII. Specific performance is not decreed as a matter of right, but is of the sound discretion of the court. *Young* v. *Daniels*, 2 Iowa, 125; *Clark.* v *Railroad Co.*, 18 Barb. 350; *Blackwilder* v *Lovelass*, 21 Ala., 371.

*J. C. & B. J. Hall, Starr & Phelps*, and *Robertson*, for the appellee. [The counsel for the appellee failed to furnish the reporter with a brief of their argument.]

WRIGHT, C. J.—The objections made by respondents to the decree below, may be considered under four heads: *First:* That no contract was ever made between complainant and Abner Pierson, which can be enforced. *Second:* If any contract was made, Pierson was induced to enter into it by fraud and misrepresentations of complainant. *Third:* That Abner Pierson never had any right, legal or equitable, to eighty acres of the land; and that as to this, there can be no decree in favor of complainant, and, therefore, his action must fail. *Fourth:* That Matteson was an innocent purchaser, without notice of the contract between Pierson and complainant; and, therefore, has the superior right to the land.

The evidence of the contract, is contained in certain correspondence between complainant and Abner Pierson, and is substantially as follows: In his letter of the 25th of November, Moore, after speaking of the family relations, and various other matters, uses this language : " You spoke of the sale of your farm here. I hardly know what to say, just now. I could have received some four to six thousand dollars last summer, at the time I wrote to you. I will be willing to give you ten thousand five hundred dollars for the farm and stock that you left. That is, if you conclude I can have it; that is, if when I get an answer from you, I will answer it immediately, and will pay the one-third in sixty days, the balance in one and two years. That is, if your father will make the deed for the eighty where the barn stands. I think he will, but it is just as the notion takes him. If I do not buy it, I will take it and sell it as you order, and do the best I can for you. Still, I should much rather you would come back and see us, and then, if we could make a deal, well; if not, no harm done. If times keep as they are, I will take it at that; but if times get worse, I could not."

Pierson, in answer to this, on the 30th day of March, 1855, uses this language: " It has been sometime since I received your letter, but I now undertake to answer. I have been in a study for sometime as to the disposal of my

land. Sometime ago, I sent a power of attorney to Starr
& Phelps, but it not being properly executed, they sent me
an instrument in legal form, and. I have nothing to do but
to sign it, and get the county seal to it, which I will do in
a few days. But as you make me an offer, I consider it
my duty to say something in reply. The terms will suit
me; but the offer, or amount, does not exactly suit. I think
it hardly sufficient. I think you can muster up a few hun-
dred more than you offer. If I understand you, your offer
was ten thousand five hundred dollars, for the farm and
stock I left there. Well, you can give me five hundred
more, and take the farm with the three horses, and what
farming implements there are on the farm belonging to me,
and have possession of it on the receipt of this, if you con-
sider it a trade, and my productions of the farm, or that
which would fall to me this year. One-third of the amount
paid down, or as soon as you possibly can; one-third in one
year; and the remaining one-third, in one year from that
time; that is, in two yearly instalments—your own pro-
position—and payable in notes of five hundred dollars each,
drawing ten per cent. from date, with mortgage for the
amount on said property. I would like the first payment
made on the first of June next, and the accounts there
against me, where there is no settlement to be made, paid
up, which I will inform you in another letter. You can
make up your mind as to what you will do, by the time the
power of attorney reaches Starr & Phelps, and if you con-
clude to take it, draw writings, as I have directed, or stated
to you. I shall authorize them to sell for twelve thousand,
and no less—one-third paid down, and the remainder in
one, two, and three years; notes drawing ten per cent. in-
terest from date, with mortgage or deed of trust. Write
as soon as you receive this, respecting what you can, or will,
do. I shall send the power of attorney next mail, and
will have them receive a deed from father for the eighty
south of the road. I will also state the terms on which
you are to have the place, provided you can come up to
the mark, or the terms. I shall authorize them to sell. If

it suits you better, make the arrangements at once, and I will be just as well suited, and at less expense. This is about all I have to write on this subject, at present."

On the 23d of May, 1855, Moore writes: "I have received yours of the 3d of April." He then proceeds to refer to different members of the family—of their health and engagements—and as to the farm trade, writes thus: "As regards your proposition of the farm, I have concluded I would take you up at your offer, although it is a big pile of money. But I am in the country, and farming it some, and find that I have not room to do anything." He then gives some reasons why his location was an unpleasant one, and proceeds: " I had concluded to sell and go to town, or some other place, before yours came to hand. I have several offers made, which I will close with some of them. I wish you to write to me and to John, (a brother of Abner's,) and say to him just what I am to get. I have not seen John since I received yours. He is now gone to Council Bluffs. You had a young horse colt, that you left, and I learned by John's boys that he claimed it. I expected to get all that you left and was entitled to, of horses, wagons, &c. So, I wish you to write to John, so that there will be no misunderstanding. I am sorry he is not at home. I suppose you will fully authorize Starr to have your affairs straightened up. It was with some persuasion, that I got your father to consent to make a deed for the south eighty. I think I will be able to meet it as you stated. Perhaps I cannot meet all of the first payment in two or three weeks, but I shall be able to arrange it soon."

In May, 1855, Moore went to Starr & Phelps, produced the letter received by him from Pierson, and expressed his readiness to comply with the terms and take the farm— stating that he had the money and was ready to pay, and offered to make a formal tender of it. His offer was declined by them, for the reason that they had not then received any authority to act; but that as soon as they re-

ceived the power of attorney, they would do whatever Pierson directed. He also, on the 25th of that month, notified the tenants that he had bought the place, and assumed to control and direct them.

We think the contract was complete from the moment that Moore wrote the letter of the 23d of May, and deposited it in the office. From that time, each party came under an obligation to the other, and each acquired a reciprocal right to what was promised by the other. And such a transaction amounts to a contract. Powell on Cont., 4. From the time the assent was thus given, there was a concurrence of intention between these parties. Pierson promising to do a certain thing, and Moore accepting the same, and making a promise in return. This also, according to Potheir, (Ob., 1 Ch.,) would amount to a contract. It also comes up to the definition of a contract by Chitty, (Cont., 9)—to-wit: a definite promise by the party charged —accepted by the person claiming the benefit of such promise—a request on one side, and an assent on the other.

Where the negotiation is carried on between parties residing at 'a distance from each other by letter, the rule, as recognized by Chancellor Kent, and, indeed, we may say, at this time, by all the authorities is, that the contract is completed when the answer containing the acceptance of a distinct proposition, is despatched by mail or otherwise, provided it be done with due diligence after the receipt of the letter containing the proposal, and before any intimation is received that the offer is withdrawn. As soon as an offer by letter is accepted, the consent is given, and the contract is complete, provided the party making the offer was alive when the offer was so accepted. 2 Kent, 477; *Maction* v. *Frith*, 6 Wend., 103; *Adams* v. *Lindsell*, 1 Barn. & Ald., 681; *Brisbon* v. *Boyd*, 4 Paige, 17; Chitty on Cont., 14. The case of *McCulloch* v. *Eagle Ins. Co.*, 1 Pick., 278, so far as it holds that the offer could not bind the person making it, until he received the letter announcing the acceptance, is in conflict with those above cited, and seems not to have been followed in subsequent cases in-

volving the same point. *Averill* v. *Hedge*, 12 Conn., 436; *Frith* v. *Lawrence*, 1 Paige, 434; *Canal* v. *Railroad Co.*, 4 Gill & Johns., 1; *Fitzhugh* v. *Jones*, 6 Manf., 83; 1 Parsons on Cont., 406, Note K.; 9 How., 390; 4 Wheat., 228; Story on Cont., sec. 384.    There can, it is true, be no contract without the consent of all the parties to it, but it is not necessary that their wills should concur at the same instant, if the will of the party receiving the proposition is declared before the will of the party making it is revoked.    And while the consent of one party may precede the other, yet this will of the party offering, must continue down to the time of the acceptance.    Unless the contrary appear, the presumption is, that this will does continue, upon the principle of the common law, that wherever the existence of a particular subject matter or relation, has been once proved, its continuance is presumed until the contrary is proved, or till a different presumption is afforded by the nature of the subject matter; 6 Wend., 103; 16 East, 55; 3 Stark. Ev., 1252.

Applying these well settled rules to the case before us, we have no difficulty in determining it.    Taking the correspondence in connection, it shows a distinct proposition on the part of Pierson, which was clearly and unconditionally accepted by complainant.    This acceptance was declared with due diligence, also.    For while it does not definitely appear, when Moore received Pierson's letter, it is manifest from its date, that it could not have been many days before answered.    And this position is strengthened by the further fact, that Pierson said in this letter, that he should forward the power of attorney by the next mail, and this was not received by Leibrick, until near three weeks after Moore wrote his letter of acceptance.

It is suggested, however, that Pierson's letter is dated March 30th, and that Moore, in his letter, accepts a proposition made in one of April 3d, 1855, and that there is, therefore, no evidence of what proposition he did accept. It is true that Moore, in his letter of May 23d, does say that he has received his (Pierson's) letter of April 3d.    To

his bill, however, he attaches a copy of the letter, dated March 30th, and avers that the proposition contained in this letter, is the one which he accepted. This averment is not denied, or rather, it is not claimed or pretended in the answer of Pierson, that he made any other proposition, or wrote any other letter of the 3d of April, or of any other date, changing the conditions contained in the one upon which complainant relies. Under such circumstances, we think it but reasonable to say, that Moore mistook the date of the letter, and especially so, when we consider that if there was another, Pierson knew it, and it was easy for him to have so averred, and called upon complainant to produce it.

It is also urged that the contract was not complete, for the reason that Pierson speaks of intending to write subsequently, about the payment of some debts owing by him; and for the further reason, that Moore refers to some misunderstanding or possible difficulty as to a portion of the personal property. The payment of these debts, however, was in no manner connected with the price to be paid for the land, or the terms of payment. There was nothing for Moore to know in relation to those debts, upon which his acceptance of the proposition was to depend. It was not suggested, even by Pierson, that the making of the contract was to depend upon Moore paying those debts; or that he would, in a subsequent letter, fix additional terms. It is quite evident that Pierson, when he wrote this letter, expected the whole matter to be closed up for him by his attorneys, Starr & Phelps, and the reference in this letter to his debts, was made to advise Moore that he wanted them paid, of which debts he was to inform him in another letter.

As to what Moore says about the personal property, it will be observed, that though he speaks about his desire to have a perfect understanding as to the property, he gives no intimation of waiving or delaying, for this reason, his acceptance of the terms, or trade, proposed. In *Fitzhugh* v. *Jones*, 6 Munf., 83, the owner of the land accepted the

terms proposed by one offering by letter to purchase, but stated in his reply, that the purchaser must take the responsibility of establishing the lines. The person offering to buy, answered, assenting to the terms, but expressed a wish that the owner's agent would attend to the settlement of a portion of the boundaries. It was held, that there was a complete contract for the sale of the land. The two cases are not unlike. And that Moore understood that the contract was complete, and did not intend to make it depend upon what personal property he got with the farm, is manifest from the fact, that he immediately advised the tenants of the purchase—immediately and promptly assumed the control of the place—within a few days, showed the letter to those whom he had reason to suppose were, or would be, Pierson's attorneys—and declared his acceptance of the terms, and readiness to comply. If he regarded that the completion of the contract was to depend upon the personal property he might receive, his course with the tenants and attorneys was, to say the least of it, inexplicable and unreasonable.

As to the second objection, that Moore procured this contract by fraud and misrepresentation, we are very clear that it is not sustained by the proof. To sustain this position, respondents rely almost entirely upon the fact, that the price to be paid, was grossly inadequate—that complainant was to pay $11,000, whereas Matteson agreed to, and was to pay $24,000. At the time this negotiation was commenced, in the autumn of 1854, the weight of the testimony is, that the land was not worth to exceed $50 per acre. In the spring, it advanced very rapidly, as did all the lands in that vicinity, and indeed, throughout the State. It is quite evident that by the terms of the contract, as finally settled in May, 1855, Moore made what is admitted to have been a good bargain. When he made his first offer, however, and when Pierson wrote to him, the terms were not so favorable to Moore. Had Pierson been on the place the previous autumn, it is not improbable that the trade would then

have been closed. If, without fraud or misrepresentation on his part, Moore succeeded in obtaining what was to him an advantageous contract, it was his right, and he is entitled to the benefit of it. Was there any fraud? It does not appear that, at any time, he made any repre-resentations as to the value of the land. He, in one or both of the letters, speaks of the condition of the railroads being constructed near the land, and what he then said is fully sustained by the proof. It will be seen, also, that he expressed a wish that Pierson should return, and see and judge for himself. His letter also shows, (and the testimony of one or more witnesses proves the same fact), that he consulted with Abner's father about the trade, and that the latter finally consented to make a deed for the eighty acres in his name. Abner not only had a father living near the land, but two or more brothers, his brother-in-law, Leibrick, and other friends and relatives, in the same vicinity, with whom he had every opportunity to correspond, and learn the actual value of the land. If the father supposed that complainant was obtaining an unconscionable advantage over his son, it would seem that he would promptly have refused to convey the eighty, the legal title to which was in him, and as promptly have advised his son not to accept the offer.

We acknowledge that we have felt strongly inclined to give to Abner, the benefit of the, at least, seemingly better contract made by the father with Matteson. And was there any fair ground for concluding, that complainant obtained his contract by fraud, or by the use of any other than fair means, we should most readily so hold. We are unable to discover, however, that complainant has been guilty of any misrepresentation, or that he resorted to any other than the most honorable, open and candid means in making the purchase. Under such circumstances, as already suggested, we are not at liberty to deny to him his rights under his contract. For, while Abner Pierson may suffer largely by being held to his contract with Moore, and as a consequence, deprived of the benefit of the con-

tract with Matteson, it is but the result of his negotiation fairly entered into. It may be a case of great hardship, but this cannot change the relative rights of the parties. Hard cases must not be allowed to make bad equity, any more than bad law.

We are next to inquire, whether Abner Pierson had any right to the eighty acres, held by his father. It seems that John Pierson had a number of sons, and had helped all of them, either by giving them land, or means with which to enter the same, or start in business. One of his sons, Levi, a twin brother of Abner, died in 1843 or 1844, being unmarried and leaving no issue. He at that time was in possession of this eighty, and held the title, either legal or equitable, as also another tract of land. Whether the legal title was in the father, and the equity in the son, or whether the father's legal right accrued upon his death, and as the heir of Levi, does not satisfactorily appear. The improvements upon the eighty, at the time of Levi's death, were put there by him, and there is nothing to show that the father ever expended a dollar upon it. On his death-bed, Levi desired that his father should see that his interest in this eighty, should be given to his brother Abner; and this desire the father promised to see carried out. His other land, Levi desired to be given to his brother, Johnson Pierson. After his brother's death, Abner took possession, and made large and valuable improvements upon this eighty—which adjoins the one hundred and sixty acres, now also in controversy, and is, in fact, a part of the farm. These improvements consist of fencing a large portion of it, and building a barn, at an expense of some $1,000 or $1,200. During all this time, the father resided near the premises, and had full knowledge of the possession and improvements. On two or three occasions, he expressed his intention to carry out the will of Levi, in relation to this eighty, and he uniformly spoke of it as Abner's. Abner continued in possession, and enjoyed the rents and profits to the time of his leaving for California, and after that occupied

it by his tenants—this possession covering a period of some twelve or fourteen years. When Moore was negotiating with Abner, knowing that the legal title was in the father, he called upon and obtained his promise to make the deed. Subsequent to this, the father spoke to other persons of Moore's trade with Abner, and stated that he was glad that Henry was to get the place, and that he had agreed to help him make the payments.

Under these circumstances, shall John Pierson be now required to convey this eighty to Moore? And upon this question, we have had more doubt than any other in the case. We have concluded, however, that the position of respondent (John Pierson), cannot be sustained. Our reasons for this conclusion we will briefly state.

As between the parties, a conveyance by a father to a child will be upheld, as being founded upon a meritorious consideration. When the agreement is executory, however, exists in parol, and is unassisted by the fact of possession, and permanent improvements, taken and made upon the faith of such promise, the courts will not aid the donee by decreeing its performance. Where, however, the promise is clearly, definitely, and conclusively established, and where the child, upon the faith of it, has entered into possession, and made valuable and permanent improvements, cases are not wanting that recognize the right of the donee to claim and require a specific performance. *Stewart* v. *Stewart*, 3 Watts, 253; *Young* v. *Glendening*, 6 Watts, 509. "The opposite rule," says Tyghlman, C. J., in *Tyler* v. *Eckhart*, 1 Binn., 378, "would enable the parent to practice a fraud, by making a gift which he knew to be void, and thus entice his child into a great expenditure of money and labor, of which he intended to reap the benefit himself." In such case, however, it will not avail the donee, if his improvements are temporary, of but little value, or simply for his convenience as an occupying tenant. They must be of a permanent character—such as clearly show that he regards, and designs to treat the land as his own, and relies upon the promise of the father.

We are aware that there are cases holding the opposite view. Some of them, that have been so classed, however, it will be found, arose between the donor and his creditors. *Rucker v. Abell*, 8 B. Monroe, 566. This case is not of that character, and the distinguishing element is appreciable at once to every professional mind. In others, again, it did not appear that possession was taken, or the improvements made upon the faith of the undertaking of the donor. *Adamson v. Laub*, 3 Blackf., 446. In another case, it did not appear that the donee had put any improvements upon the land. *Black v. Cord*, 2 Har. & Gill, 100. The case of *Pickard et al.* v. *Pickard's Heirs*, 23 Alab., 649, is quite like this, and yet unlike it, in one important particular. There the donor did not, by his silence or words, induce a third person to purchase of the donee. If he had, in the language of the judge in that case, when referring to *Stone* v. *Button*, 22 Alab., 543, " it would have amounted to a gross fraud, to permit him to disaffirm the transaction, and avoid the sale which he had superinduced, and afterwards sanctioned."

And without now determining that the complainant would be entitled to relief, if the case stood alone upon proof of the gift, and possession and improvements made, upon the faith of the promise, we think it would be unconscionable and inequitable to deny it, when we take into consideration the further fact, that the father, by his own positive and unambiguous acts, induced the trade and sanctioned it. It is not a case even where the owner of land remains silent, when he knows that other parties, in his presence, are about to do some act which they would not, if they knew of his title. But he encouraged the purchaser —promised Moore that he would make the deed—proposed to assist him in making the payments—and afterwards expressed his satisfaction that the land was thus to be kept in the family. Under such circumstances, he is estopped, in a court of equity, from disputing the validity of the purchase, or the right acquired by virtue of the contract. Story's Eq. Jur., sec. 835; *Stone* v. *Barker*,

6 Johns. Ch., 166; *Pickard* v. *Sears*, 6 Adolph. & Ellis, 474; *Lucas* v. *Hart*, 5 Iowa, 415. Respondents further object that the bill does not set out or state the particulars of the promise, and that therefore there can be no decree for complainant, as to this eighty acres. It is true, that the bill is not as full and explicit in this respect as it might be; but we do not think the defect is one of such substance or materiality, as to avail respondents at this time. A want of equity in a bill—or the fact that taking it all as true, the complainant is not entitled to the relief prayed for—may be taken advantage of on the final hearing, or on appeal. Not so, however, if the defect is one of form, or if the case stated is such that the court can properly proceed to a decree. Story's Eq. Plead., 528; *Kriechbaum* v. *Bridges and another*, 1 Iowa, 14.

The fourth and last point to be considered, is that Matteson was a purchaser, without notice, for a valuable consideration. As to this, we have no difficulty. For the one hundred and sixty acres, he never had any contract with any person authorized to bind or contract for the owner, Abner Pierson. His contract was with John Pierson, and it is not pretended that he had any authority or right to sell this portion of the land. As to the eighty acres, while the legal title was in John Pierson, the equity and occupancy was in Abner, or in Moore, his vendee. Matteson was on the premises and examined them, and found that John Pierson was not in the possession. The possession being in another, it was his duty to inquire into its character, and by what right the occupants held. *Lash* v. *Butch*, 4 Iowa, 215. The purchaser of real estate, in the possession of a third person, is bound to take notice of such person's title to the possession, whether his title be legal or equitable. *Johnston* v. *Glancy et al.* 4 Blackf., 94; *Moreland* v. *Lemasters*, Ib., 383. Before Matteson purchased, Moore, as we have before shown, informed the tenants of his purchase, and that they held under him. By making the proper inquiry, Matteson would have ascertained that the persons in possession were not the ten-

ants of John Pierson, but of Abner, if not Moore. He would have found that John Pierson had not been in possession for some fourteen years, if ever; and that all the improvements were made by other persons. The possession was sufficient to put him upon inquiry, and amounted to constructive notice of the title under which it was held. So that, without determining whether the testimony shows that he had actual notice, (a question, perhaps, not free from difficulty), we think, for the reasons above stated, that he cannot be said to be a purchaser without notice. We give no effect to the deed made by Leibrick, in considering this part of the case, from the fact that it does not appear to have ever been delivered. Indeed, it is shown that Matteson refused to receive it, preferring to rely upon the bond which he held against John Pierson.

We conclude, therefore, that the decree below must be affirmed.