FARMERS' GUARANTY STATE BANK OF JACKSONVILLE et al. v. BURRUS MILL & ELEVATOR CO.   (No. 8900.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 19, 1918.)

1. EVIDENCE ☞76 — FAILURE TO TESTIFY AS EVIDENCE.

Where the issue was whether defendant authorized the drawing of a draft and its payment by his codefendant, his failure to testify that he did not, although he had pleaded a denial, raises the presumption that if he had testified, his testimony would not have supported his plea.

2. PRINCIPAL AND AGENT ☞123(1) — EVIDENCE—AUTHORITY TO ACCEPT DRAFT.

In an action by the drawer against a bank which had accepted and paid his draft by drawing cashier's check, but subsequently recalled the cashier's check before delivery to plaintiff, evidence held sufficient to show that the drawee

authorized defendant to accept and pay the draft.

3. BILLS AND NOTES ☞69 — VERBAL ACCEPTANCE—SUFFICIENCY.

Acceptance of a draft may be verbal, and need not be in writing.

4. BILLS AND NOTES ☞70 — IMPLIED ACCEPTANCE—CONDUCT OF DRAWEE.

An acceptance of a draft may be implied from the drawee's conduct.

5. BANKS AND BANKING ☞159—DRAFTS—PURCHASE OR AGENCY TO COLLECT.

Where a bank, at plaintiff's request, had forwarded a draft to defendant bank which was accepted and paid by defendant's cashier's check, but defendant subsequently stopped delivery of its check before it was received by the first bank, facts held to support a finding that the first bank merely acted as plaintiff's agent, and was not therefore a proper party to the suit as a purchaser of the draft.

6. BILLS AND NOTES ☞72 — ACCEPTANCE — REVOCATION.

Where the drawer of bill of exchange presents it to his bank which transmits it to defendant bank, which pays it by its cashier's check under an agreement with the drawee, incloses the remittance in an addressed and stamped envelope, and mails it, such action makes defendant's acceptance a finality, depriving both it and the drawee of the right to withdraw the acceptance given.

Appeal from District Court, Tarrant County; Ben M. Terrell, Judge.

Action by the Burrus Mill & Elevator Company against the Farmers' Guaranty State Bank of Jacksonville and D. L. Hughes, impleaded. From a judgment for plaintiff against defendant bank and in favor of defendant bank over against D. L. Hughes, defendant bank and Hughes appeal. Affirmed.

M. C. H. Park and Allen V. McDonnell, both of Waco, for appellants.

Capps, Cantey, Hanger & Short and David B. Trammell, all of Ft. Worth, for appellee.

BUCK, J. This is a suit by the Burrus Mill & Elevator Company of Ft. Worth, Tex., against the Farmers' Guaranty State Bank of Jacksonville, Tex. The bank impleaded D. L. Hughes. Plaintiff's petition contained two counts alleging substantially that:

(a) It had drawn a draft on D. L. Hughes for $1,000, in care of defendant bank, and deposited such draft with its agent, the Ft. Worth National Bank, for collection; that on receipt of such draft defendant accepted and paid the same, and thereupon drew a cashier's check or exchange on Ft. Worth, Tex., in payment of such draft and returned the same to said Ft. Worth National Bank at Ft. Worth, Tex.; that after so accepting and paying said original draft and remitting therefor, defendant, for reasons unknown to

plaintiff, wired to the postmaster at Ft. Worth to return the letter, remitting to the plaintiff's agent the Ft. Worth National Bank the proceeds of the draft aforesaid, thereby preventing the manual delivery of such cashier's check or exchange to plaintiff; that the check or exchange so remitted was of the value of $1,000, and that through defendant's retaking possession of the same, plaintiff had been damaged in such amount, with interest.

(b) In the second count plaintiff alleged: That, on or about November 4, 1914, defendant bank made, executed, and delivered to the Ft. Worth National Bank, plaintiff's agent, its certain draft or bill of exchange substantially in words and figures as follows:

"Farmers' Guaranty State Bank of Jacksonville.

"Jacksonville, Texas, Nov. 4, 1914. No. 664.

"Pay to the order of Ft. Worth National Bank, $997.50, nine hundred and ninety-seven dollars and fifty cents.

"Farmers' & Mechanics' National Bank.

"Ft. Worth, Texas.

"C. B. Newsome, Asst. Cashier."

That by the execution and delivery of said draft the defendant became liable and bound to pay plaintiff through its said agent, the Ft. Worth National Bank, the amount for which said draft was drawn at Ft. Worth, Tex.; it being further alleged that the Farmers' & Mechanics' National Bank of Ft. Worth was a large banking corporation doing business in Ft. Worth, with which defendant at said time had on deposit sufficient funds to cover such draft.

Plaintiff further alleged that the original draft drawn by the plaintiff was deposited with the Ft. Worth National Bank under an agreement between plaintiff and said bank, that the latter was acting as plaintiff's agent for the collection of the draft, and that said bank indorsed and forwarded said draft by mail to defendant at Jacksonville for collection; that said draft was so forwarded on November 2, 1914, reaching defendant on the evening of the 3d or the morning of the 4th of November; that upon receipt of said draft the defendant paid the same, and thereupon drew the exchange hereinbefore set out for the amount of the original draft drawn by plaintiff on D. L. Hughes, less exchange charges of $2.50, made by defendant for its services, and remitted said draft for $997.50 to plaintiff's agent, the Ft. Worth National Bank, by mail, such being the usual and customary method of remitting such items and the manner and method by which the Ft. Worth National Bank and plaintiff expected and authorized such remittance to be made.

Defendant answered by general denial, various special denials, and specially pleaded

207 S.W.—26

that at the time of the occurrence mentioned in plaintiff's petition the draft originally drawn by plaintiff was the property of the Ft. Worth National Bank, and further pleaded that the exchange drawn by it on the Farmers' & Mechanics' National Bank of Ft. Worth, and remitted to the Ft. Worth National Bank, on which plaintiff sued in the second count, was without consideration. Plaintiff's supplemental petition alleged that at the time the defendant remitted for the amount of plaintiff's draft on D. L. Hughes, less collection charges, the defendant had authority from Hughes to accept and remit for such draft, and that the transaction constituted a payment by defendant bank, and plaintiff was therefore entitled to recover the $997.50. In the alternative, it averred that the transaction constituted an acceptance of the original draft by defendant bank, or an assignment or taking up by it, which entitled plaintiff to recover the value of the exchange so remitted by defendant bank to plaintiff's agent. It was further alleged that the draft was drawn under an agreement by and between J. A. Hughes and D. L. Hughes; that the sum of $1,000 due by J. A. Hughes & Son to plaintiff should be paid; that J. A. Hughes & Son had become insolvent and had gone through bankruptcy; and that plaintiff would lose its debt unless it recovered of the defendant bank.

The evidence discloses that on November 2, 1914, J. A. Hughes & Son, merchants at Long Branch, Tex., a town not many miles from Jacksonville, were owing plaintiff some $1,600 on account; that shortly prior to said date J. A. Hughes advised Howard Miller, a representative of plaintiff, that D. L. Hughes, a nephew of J. A. Hughes, was purchasing an interest in the business, and that if the plaintiff would draw its draft on D. L. Hughes through the defendant bank said draft would be paid; arrangements having been made therefor. Mr. Miller communicated with plaintiff by phone, and the draft was accordingly drawn and deposited with the Ft. Worth National Bank for collection. At the time of said deposit the plaintiff received credit for the full amount thereof in his passbook in the usual and ordinary manner. The passbook of plaintiff contains the following notice:

"Notice to Depositors.

"All items on outside points are credited on receipt with the understanding that you will reimburse us should payment of any be refused.

"Should returns sent by collecting agents for such be dishonored, the amount will be charged to your account and draft or drafts delivered to you.

"We will use our discretion as to sending direct or through intermediary banks for collection, acting as your agents only and assuming no responsibility beyond the carefulness in the selection of such agents.

"The Ft. Worth National Bank,

"Ft. Worth, Texas."

Said passbook showed deposits of various amounts on practically every business day from July 31, 1914, until long subsequent to the date of the deposit. On November 2, 1914, appears an entry of the deposit of $5,-055.45, in which is included the $1,000 draft in question, credit for which was given at its face value. The trial court found that:

"The evidence justifies the inference that plaintiff was a large depositor of the Ft. Worth National Bank, and that the bank relied upon plaintiff's agreement to reimburse it for the amount of the credit if payment should be refused without attaching any value to the draft itself.

"I find from the terms of the agreement contained in plaintiff's passbook, and the other facts in evidence, that it was not the intention of plaintiff to sell, or the Ft. Worth National Bank to purchase, the original draft, and that it was received and forwarded by such bank for collection only, in the capacity of plaintiff's agent."

The court further found: That the draft was forwarded by the Ft. Worth National Bank to the defendant by mail. That it was received by the defendant on the night of November 3d or on the morning of the 4th. and that under the direction of the defendant's cashier, Mr. Howard, the assistant cashier, C. B. Newsome, issued to the Ft. Worth National Bank its exchange or draft on the Farmers' & Mechanics' Bank. That defendant's cashier told Newsome that D. L. Hughes did not have sufficient funds to his personal account to take care of the draft, yet he had made arrangements that would take care of it in a few days. The draft was mailed, accompanied by a letter of remittance, on November 4th. That at this time defendant bank had on deposit with the Farmers' & Mechanics' National Bank at Ft. Worth more than enough funds to cover the exchange, and that the same would have been paid if presented to the Farmers' & Mechanics' Bank. On the day after the mailing of the $997.50 exchange, D. L. Hughes called up the defendant bank from Long Branch, and asked what had been done with the draft drawn on him by plaintiff, to which defendant's cashier replied that he had remitted for same. Hughes then requested that the remittance be stopped if possible, and defendant's cashier replied that he would do all he could to do so. The defendant bank thereupon wired to the postmaster at Ft. Worth to secure the return of the letter, and also wired the Farmers' & Mechanics' Bank to stop payment. The letter was returned without delivery to the addressee, the defendant bank. Whereupon defendant bank destroyed or canceled the draft for $997.50, and had its cashier protest the original draft drawn by plaintiff. Later the protest fees were paid to the defendant bank by D. L. Hughes.

On the same day that the defendant bank had taken steps to procure the return of its remittance to the Ft. Worth National Bank, Miller, plaintiff's agent, called on the defendant bank to inquire about the draft, and was told that it had been received and paid, but that D. L. Hughes had requested that payment be stopped, if possible, and they were endeavoring to do so.

The court further found: It was usual and customary to remit items such as the draft drawn by plaintiff, by Ft. Worth or New York exchange, through the mail in the same manner adopted by the defendant bank, and this was the method by which the Ft. Worth National Bank expected that this remittance would be made. The D. L. Hughes is solvent, but that J. A. Hughes & Son are insolvent, and have been adjudged bankrupt. That D. L. Hughes, at the time of the transaction related, had just had his disabilities of minority removed, and had either purchased an interest in the business of J. A. Hughes & Son or was negotiating therefor. That the original draft was drawn by plaintiff with the knowledge and acquiescence of D. L. Hughes, and that he either made or authorized the making of the arrangements under which the draft was paid by defendant bank. That defendant bank was fully satisfied with the arrangements which had been made to take care of the draft, and in reliance thereon took up the draft and remitted therefor to the Ft. Worth National Bank. That it only attempted to secure the return of the remittance in order to accommodate D. L. Hughes, who had either rescinded his purchase of an interest in the business of J. A. Hughes & Son, or had failed at the last moment to consummate such purchase. That the remittance made by defendant bank to the Ft. Worth National Bank was not made through mistake, nor was there a want of consideration for the obligation contained in the exchange remitted by it to the Ft. Worth National Bank.

Judgment was rendered for plaintiff against the defendant bank for $997.50, with interest, and in favor of the defendant bank over against D. L. Hughes for a like amount. From this judgment the defendant and D. L. Hughes have appealed.

The evidence further shows that upon the return of the original draft, protested, the Ft. Worth National Bank charged to, or collected from, the plaintiff $1,000, and delivered said draft to plaintiff; that prior to the drawing of the draft by plaintiff, W. J. Weatherby, one of the directors of the defendant bank, and also vice president, nonactive, and who had been the guardian of D. L. Hughes, and who had not yet made a settlement with his ward, went to the defendant bank and told its officers that D. L. Hughes would probably want $2,000, and that he, Weatherby, wanted the bank to have the money ready for him; that J. A. Hughes, uncle of D. L. Hughes, would probably draw

the draft. At this time the defendant bank owed Weatherby, as the guardian of D. L. Hughes the sum of $2,000. This request of Weatherby's to the defendant bank was made as a result of a conversation between him and J. A. Hughes, in which the latter told Weatherby that D. L. Hughes was going to buy an interest in the business of J. A. Hughes & Son, and that it was necessary to have the sum of money available for D. L. Hughes to pay for such interest, and Weatherby told J. A. Hughes that he did not have the money at the time, but that he would make arrangements with defendant bank to take care of a draft drawn, not to exceed $2,000. The bank agreed with Weatherby to take care of the draft to be drawn.

Appellants in their separate briefs present many assignments of error. But we believe that the questions involved in this case will be largely clarified and settled by the determination of the questions of fact as to whether: (1) D. L. Hughes, either directly or through his former guardian, W. J. Weatherby, instructed the defendant bank to honor the draft in question, or one in like amount, to be paid in part settlement for the purchase of an interest in the business of his uncle, J. A. Hughes; and (2) whether the defendant bank accepted said draft and remitted for same in compliance with such instructions by or on behalf of D. L. Hughes. The following evidence bearing on this issue was admitted without objection, to wit: Howard Miller, plaintiff's salesman and agent, testified that he had sold J. A. Hughes & Son considerable goods, including several cars of flour, and that in October or November of 1914, J. A. Hughes & Son owed the plaintiff some $1,600; that witness called on J. A. Hughes and made an effort to collect the account; that Hughes told him he would be able to make a payment with money he was going to get from D. L. Hughes, who was to buy an interest in the business, and instructed Miller to call him up on a certain day, and he would give positive instructions what to do; that later he did call up J. A. Hughes, and he stated that he had made a deal with D. L. Hughes, and he instructed Miller to make a draft through the Jacksonville bank on D. L. Hughes for the amount plaintiff was trying to collect. Miller requested that J. A. Hughes mail plaintiff a check for the amount, but J. A. Hughes said, "No," that all the necessary arrangements had been made with the bank for it to be handled that way. The information was communicated to the plaintiff, and resulted in the drawing of the draft in question. Later the plaintiff requested Miller to call on the Jacksonville bank and make inquiry about what had been done with reference to the draft. Some one in the bank told Miller that the draft had been paid, but that the day following D. L. Hughes had instruct-

ed them to stop payment. At this time Miller was informed that the bank had paid the draft on former instructions to pay it, and that the bank had remitted, "former instructions from the party on whom it was drawn." C. B. Newsome, assistant cashier of the defendant bank, testified that at the time the draft in question reached the defendant bank D. L. Hughes did not have enough money to his personal account to take care of it, but that the cashier of the defendant bank, Mr. Howard, told him that arrangements had been made, and that D. L. Hughes would take care of it in a few days. He was instructed to make the remittance and to hold the draft as a cash item until arrangements had been made by D. L. Hughes for the funds. When D. L. Hughes called up the defendant bank the day after the remittance had been made, and asked what had been done with the draft of $1,000 drawn on him, and was told that it had been paid, he did not question the authority of the bank to pay the same, nor give any reason why he wanted the draft returned. Howard testified that he said, "What have you done with that draft drawn on me by the Burrus Mill & Elevator Company?" When Howard informed him that the bank had remitted the same, as advised by Mr. Weatherby, Hughes replied, "My God! Is there any way of stopping that?" Howard told him that he did not know, but would do all he could to stop the draft, and immediately wired the postmaster and the Farmers' & Mechanics' Bank. Howard further testified that when the defendant bank received the draft in question it did not notify any one, for the reason that he understood from Mr. Weatherby that the plaintiff would draw a draft on D. L. Hughes for $1,000, and had been advised by Weatherby to remit for same; that the protest fees of $4 were paid the defendant bank by D. L. Hughes.

[1] Neither J. A. Hughes nor D. L. Hughes testified in the trial of the case. It was admitted in oral argument that D. L. Hughes was present at the time of the trial, and that the record disclosed that fact. If D. L. Hughes did not authorize the drawing of the draft by plaintiff and the payment thereof by defendant bank, his failure to so testify, in the absence of any reason for such failure in the record, justifies this court in concluding that if he had testified his testimony would not have supported his plea of denial. "Where the proof tends to establish a fact, and * * * it is within the power and to the interest of the opposing party to disprove it if false, the silence of the opposing party not only strengthens the probative force of the affirmative proof, but of itself is clothed with a certain probative force." Pullman Palace Car Co. v. Nelson, 22 Tex. Civ. App. 223, 54 S. W. 624. The failure to produce evidence within a party's control raises the presumption that, if produced, it would operate against him; and every intendment will

be in favor of the opposite party. Bailey v. Hicks, 16 Tex. 222; Thompson v. Shannon, 9 Tex. 536.

Usually the force of evidence, though slight, is greatly increased by the failure of the opposite party to rebut it, where it is obvious that the means to do so are readily accessible to the party. Chandler v. Meckling, 22 Tex. 44; Needham v. State, 19 Tex. 332; Mutual Life Ins. Co. v. Tillman, 84 Tex. 31, 35, 19 S. W. 294.

[2-4] Hence we are of the opinion that the evidence is sufficient to establish the fact that D. L. Hughes, either directly or through an agent, authorized the defendant bank to accept and pay the draft in question upon presentation, and that the remittance made by the bank was in compliance with such instructions. Acceptance of a draft may be verbal, and need not be in writing. Neumann v. Schroeder, 71 Tex. 81, 8 S. W. 632; White v. Dienger, 25 S. W. 666; 1 Daniel on Negotiable Instruments, § 496, p. 591. An acceptance may be implied from the conduct of the drawee, and any action which clearly indicates his intention to comply with the request of the drawer, or any conduct of the drawee from which the conclusion that he had intended to accept the bill and intended to be so understood, may be regarded as an acceptance. 1 Daniel on Negotiable Instruments, § 499, p. 596.

[5] In view of the facts detailed with reference to the deposit of the draft in question in the Ft. Worth National Bank by plaintiff, and its subsequent taking up by plaintiff, we overrule those assignments of the appellants which attack the finding of the court to the effect that the Ft. Worth National Bank was merely acting as the collecting agent of the plaintiff in the transaction, and was not a purchaser of the draft. In 1 Daniel on Negotiable Instruments (6th Ed.) p. 427, it is said:

"As to the facts or course of dealing from which a purchase will be implied they should be such as show that the agent has become absolutely responsible for the collection of the paper. The idea of a purchase will be repelled by the fact that the paper was credited to the customer without discount; that the agent exercises the right to charge back the paper to the customer's account if returned unpaid; that it accepts no risk on the paper; and often by the terms and conditions upon which the relations between the parties have been established, showing that only an agency was intended. The presumption is that the depositor does not intend to part with the title to his paper, subject to be rebutted only by evidence of an express contract to the contrary, or of facts from which such a contract must be inferred."

See 2 Michie on Banks and Banking, p. 1374; 7 C. J. p. 600; Fanset v. Garden City Bank, 24 S. D. 248, 123 N. W. 686; Armour Packing Co. v. Davis, 118 N. C. 548, 24 S. E. 365.

[6] Since we have concluded, from the facts in this case and under the authorities cited, that the Ft. Worth National Bank was not a purchaser of the draft, and therefore was not the proper party plaintiff, as contended by the appellants, it follows that if the remittance by the defendant bank constitutes a payment, such payment was to the Ft. Worth National Bank, plaintiff's agent, and for the benefit of plaintiff. The Ft. Worth National Bank, as an agent of plaintiff, having selected the mail as an agency or medium by which the draft was sent to D. L. Hughes and the defendant bank, if D. L. Hughes had prior thereto authorized the defendant bank to accept said draft in his name, and the latter did so accept it and drew a remittance to cover same, the posting of it in the mail, addressed and stamped, constituted such acceptance a finality, and deprived both Hughes and the defendant bank of the right to withdraw the acceptance given. In Mortgage Co. v. Davis, 96 Tex. 508, 74 S. W. 18, 97 Am. St. Rep. 932, it is said:

"The authorities are well-nigh unanimous in asserting that, when a party submits to another through the mail, a proposition of purchase or sale, the receiver of the proposition has the right, within a reasonable time, and before it is withdrawn, to accept by a writing deposited in the post office, duly stamped, ready for carriage and delivery; and such an acceptance binds the proposer of the contract from the time the deposit is made in the post office, whether it be delivered or not." Blake v. Insurance Co., 67 Tex. 163, 2 S. W. 368, 60 Am. Rep. 15; Bryant v. Booze, 55 Ga. 445; Levy v. Cohen, 4 Ga. 13; Moore v. Pierson, 6 Iowa, 292, 71 Am. Dec. 409, and other authorities cited.

In 21 R. C. L. § 30, p. 35:

"Where a debtor is directed by a creditor to remit money by mail, the posted letter constitutes a payment, although the letter is lost."

We have examined with care the assignments cited by the appellants in their briefs, and believe that the conclusions reached by us are in conformity with the facts in this case, and the law, as laid down by our own Supreme Court, and by other courts and text authorities. Hence, all assignments are overruled and the judgment of the trial court is affirmed.

Affirmed.