UNIVERSAL MILLS, Appellant,

v.

Gilfert MAUK, Appellee.

No. 3474.

Court of Civil Appeals of Texas.
Waco.

Sept. 12, 1957.

Rehearing Denied Oct. 24, 1957.

Fred L. Wallace, Fort Worth, Frank A. Woods, Franklin, for appellant.

W. S. Barron, Bryan, Bryan Russ, Hearne, Herman Yezak, Bremond, for appellee.

TIREY, Justice.

Appellant, a corporation and resident citizen of Tarrant County, Texas, has perfected its appeal from an order overruling its plea of privilege to be sued in the county of its residence (non-jury). Upon written request of appellant the court filed findings of fact and conclusions of law. We quote the material parts thereof:

"Findings of Fact

"1. Plaintiff is, and was at all times pertinent to this cause, a resident of Robertson County, Texas.

"2. Defendant is a domestic corporation, incorporated under the laws of the State of Texas, with domicile in Tarrant County, Texas.

"3. H. P. Schultz, doing business as H. P. Schultz & Son and as Paul Schultz & Sons, was the agent of defendant in Robertson County, Texas.

"4. The defendant contracted to finance plaintiff in the turkey business for 1955 in Robertson County, Texas, by purchasing for plaintiff turkey poults and supplying feed. The contract was made in Robertson County, Texas, and performed in Robertson County, Texas.

"5. In compliance with the contract, defendant purchased for plaintiff on June 24th, 1955, 2,287 turkey poults, for which plaintiff executed to defendant notes for $1,275.00 and $472.20, payable at Fort Worth, Texas, and supplied feed to plaintiff in the amount of $7,944.51, for which plaintiff executed notes payable to defendant in Fort Worth, Texas, and the notes for poults and feed were secured by a chattel mortgage on the turkeys.

"6. Defendant shipped to plaintiff on October 6th, 1955, 150 sacks of feed unfit for turkeys because it was in large and small lumps and was heavily infested with mould. Plaintiff took a specimen of the moulded feed to defendant's agents, H. P. Schultz and Clem Woods, who told plaintiff the feed would not hurt the turkeys, and the defendant had no other turkey feed at the time. Immediately after eating the moulded feed, the entire flock of turkeys became sick, and over a period of six weeks 320 turkeys died, and many of the surviving turkeys were low grade because of sickness.

"7. Prior to October 6th, 1955, the turkeys were in healthy condition, but after the moulded feed was given, the entire flock became sick and the death of a large number resulted within a very few days, and many of the sick turkeys died from day to day for several weeks. The lumpy feed, infested with mould, furnished by defendant to plaintiff and fed to the turkeys was negligence on the part of defendant and was the proximate cause of the sickness and death of the turkeys.

"8. Plaintiff paid to defendant the entire proceeds of sale of all the remaining turkeys in his flock in the amount of $9,783.32, and paid same under protest, and gave as his reason for the protest the damages suffered by him in the loss of more than 300 turkeys from moulded feed.

"9. Defendant sued plaintiff in Tarrant County for $910.39 on the unpaid balance on the notes executed by plaintiff. Plaintiff filed an answer generally denying the debt.

"10. Plaintiff and defendant, through their attorneys, settled the litigation by payment of $700.00 to defendant, and Universal Mills, the plaintiff in the Tarrant County case, moved to dismiss the suit, which was dismissed with prejudice.

"11. There was an understanding between the parties when the Fort Worth suit was settled and dismissed that Gilfert Mauk was not agreeing not to bring a suit for damages sustained by him for sick and dead turkeys caused by moulded feed furnished by Universal Mills, and that the settlement and dismissal of said suit would not bar Mauk from bringing a future suit for damages.

"Conclusions of Law

"1. Defendant's negligence in manufacturing and delivering moulded feed to plaintiff to be fed to turkeys, and which was fed to turkeys of plaintiff in Robertson County, Texas, which caused sickness and death of his turkeys, gave rise to a cause of action in Robertson County, Texas, for plaintiff.

"2. Defendant, being a private corporation, and a cause of action having arisen in Robertson Co., Texas, against it in favor of plaintiff, gave him venue for a suit based on said cause of action in Robertson County, Texas.

"3. Defendant, being a private corporation, and a part of a cause of action having arisen in Robertson County, Texas, in favor of plaintiff, gave plaintiff venue of a suit in Robertson County, Texas, based on said part of a cause of action.

"4. Defendant, being a private corporation, and a cause of action or part of a cause of action having arisen in Robertson County, Texas, at the time said cause of action or part thereof arose, and defendant having an agent, H. P. Schultz, in Robertson County, Texas, fixed venue in Robertson County, Texas, for plaintiff to bring this suit."

A rather complete statement is necessary. Appellee went to trial on its original petition. He alleged substantially that he was a resident citizen of Robertson County, Texas, and that defendant was a private corporation organized under the laws of the State of Texas, with its home office and principal place of business in Fort Worth, Tarrant County, Texas; and that H. P. Schultz & Son of New Baden, Robertson County, Texas, were and are agents and representatives of said defendant; that at all times material to this cause of action, the defendant, through its agents or representatives, was engaged in selling and delivering its products in Robertson County, Texas; that in the year 1955 plaintiff and defendant, acting through George McCarthy, its vice-president, had a meeting at the lake house of H. P. Schultz on Camp Creek Lake in Robertson County, Texas, together with several other turkey growers; that the defendant, acting through its vice-president, George McCarthy, an expert in mixing and manufacturing turkey feed, offered a plan to plaintiff, by the terms of which the defendant offered to finance turkey growing operations of plaintiff for the turkey growing season of 1955, and turkey egg production business for the year 1956; the defendant offered to manufacture, sell and deliver through its agent, H. P. Schultz & Son, the proper feed to be used by plaintiff to feed said turkey flock. It was especially agreed between the parties that defendant would purchase poults from the DeWitt Turkey Hatchery, Waxahachie, Ellis County, Texas, nationally known as a producer of high grade turkeys, said turkeys being also noted for egg production; that said turkey poults were purchased for the reason that they were a special kind of turkeys noted for special egg production and the price for said poults was over ten cents more per turkey poult than current prices for market poults; that defendant agreed that it would advance funds to purchase 1,500 BBB tur-

key poults for plaintiff from said hatchery, and for the services rendered would make a service charge of five cents per poult; that the poults would cost 80 cents each and it would amount to $1,200 for poults and $75 for service charge, making a total of $1,275; that in addition to the above defendant purchased for plaintiff from Hubert Corn 787 poults for 55 cents each for a total amount of $432.85, plus 5 cents per poult for finance and service charge, amounting to $39.35, and making a total of $472.20; that defendant further agreed, as a part of its plan to finance said turkey program in 1955 and egg production business in 1956, to manufacture by properly mixing, shipping and delivering, through its agents or representatives, feed to be fed to the poults at the different stages of their growth; that defendant represented to plaintiff that through its "feed experts" and technicians, defendant was especially skilled in proper mixing and manufacturing turkey feed and feeding same to turkeys. Defendant agreed with plaintiff that the feed would be properly mixed, manufactured and shipped direct to H. P. Schultz & Son, who would unload and deliver the feed to plaintiff. Defendant further represented to plaintiff that if at any time it appeared that the poults were not well or making unsatisfactory progress that defendant would manufacture and finance specially prepared feed to meet the needs of growing poults, and if any of the poults became sick, defendant agreed to prepare medicated feed and furnish medication in feed necessary to cure any sickness; that defendant also agreed to have its field man or turkey specialist respond to any request of plaintiff to examine any poults that became sick at any time during the growing of same, and said field man would recommend proper medication or treatment of said poults; that defendant warranted the feed to be delivered pure, unadulterated and free from all deleterious contents; that the turkey poults were delivered in two shipments, the first 1,500 poults on June 16, 1955, and the second shipment of 787 poults on June 23, 1955; that upon arrival of the poults plaintiff began feeding them with turkey starter feed furnished by defendant, which he continued feeding until poults were seven to eight weeks old, at which time plaintiff changed to turkey grower feed nuggets; that when the poults reached eight to ten weeks of age plaintiff started supplementing the growing feed with oats, and two weeks later began supplementing with oats and milo as prescribed by defendant's field man, which feeding program continued until about October 13, 1956. That on October 6, 1955, plaintiff received from defendant through its agent, H. P. Schultz & Son, a shipment of turkey grower feed, which plaintiff thought was the same kind of feed he had been feeding them since they were approximately eight weeks old; that on October 9, 1955, plaintiff put out his first batch of feed from said shipment of October 6, 1955, and he noticed at the time that said feed was in lumps and was moulded; that plaintiff reported the condition of the feed to defendant's agent, H. P. Schultz, on October 10, 1955, and to defendant's field man, Clem Woods, on October 11, 1955; that both Schultz and Woods informed plaintiff that the feed would not hurt the turkeys and that plaintiff had to continue feeding it because no other feed manufactured or furnished by defendant was available; that after talking to Schultz and Woods, plaintiff noticed that the turkeys did not relish the feed, and twenty sacks opened by plaintiff showed mould. That late in the afternoon and night of October 12, 1955, plaintiff emptied the troughs of feed and filled the troughs with the new supply of feed, but the turkeys would not eat it; that the new feed did not contain lumps and mould that the shipment of October 6, 1955 contained; that the turkeys refused to eat the new feed and upon inspection plaintiff found the entire flock sick; that plaintiff put out medicated water for the turkeys, and a day or two later, finding that many of the turkeys had died and were dying, he contacted everybody that he could reach connected with defendant, and followed the advice of their field man and their Robertson County rep-

resentative with reference to the medication; that a specimen of the moulded feed was picked up by defendant's field man but no report was made to plaintiff on this; that every treatment recommended by defendant's field man was used to overcome the weakened condition of the turkeys; that special feed was prepared and fed the turkeys but that they failed to overcome their anemic condition; that plaintiff lost 320 turkeys, 210 of which died on October 14, 15 and 16, 1955, and 110 died at later dates; that the death of said turkeys was caused by unwholesome feed prepared by defendant and shipped and delivered to plaintiff on October 6, 1955. Plaintiff specially alleged that the injury and death of the turkeys were proximately caused by negligence on the part of defendant in that "(1) the delivery to the plaintiff by the defendant of moulded feed; (2) the failure of the defendant to pick up the moulded feed and supply plaintiff with proper feed; (3) the failure and refusal of the defendant to have the sick turkeys properly treated. Plaintiff further shows to the court that the defendant, Universal Mills, a corporation, warranted to the plaintiff that the feed defendant would furnish to plaintiff for the turkeys would be pure, clean, unadulterated, and without deleterious content." Plaintiff further alleged that the manufacture, mixing and preparation of the feed was exclusively within the control of defendant and that defendant did not properly care for the feed after it was manufactured but permitted it to come in contact with moisture to such an extent that it was moulded and unwholesome for the turkeys; that as a result of unwholesome feed and the sickness and death of the turkeys, all of which was caused by defendant's negligence, plaintiff sustained the following damages: (1) loss of 320 turkeys of reasonable market value in Robertson County, Texas, of $1,200; (2) future net profit on 320 turkeys had they grown to maturity would be $550; (3) reduced in value from No. 1 to No. 2 turkeys, which would be $55; (4) cost of medication in the amount of $606;

(5) loss on future profits on turkey egg contract in the amount of $3,140; (6) increased cost of feed on account of sick turkeys in the amount of $757; (7) additional labor on account of sick turkeys in the amount of $500. Plaintiff further alleged that this cause of action arose in Robertson County by virtue of the contract; that said contract was partly performed in Robertson County, Texas, and that the negligence and acts and omissions on the part of the defendant occurred in Robertson County, Texas. Plaintiff pleaded in the alternative that a part of said cause of action arose in Robertson County, Texas, and that the defendant is a private corporation organized under the laws of the State of Texas.

Defendant seasonably filed its plea of privilege, which was in compliance with Rule 86, Texas Rules of Civil Procedure.

Plaintiff in its controverting affidavit denied the allegations in paragraph 3 of the plea of privilege and adopted as a part of his controverting affidavit his original petition on file and referred to it and made it a part of his affidavit for all purposes. He further alleged that defendant committed, within the meaning of exception 9a of Art. 1995, Vernon's Ann.Civ.St., negligent acts or omissions upon plaintiff's turkeys in Robertson County, Texas, and that said negligence was committed by an agent or representative of defendant within the scope of his employment, and that such negligence was a direct and proximate cause of plaintiff's damages, and for such reasons venue of this suit is in Robertson County, Texas. He further alleged that defendant is a private corporation and that this suit was brought in the county in which this cause of action or a part of the cause of action arose; that said corporation had an agent in the county of this suit, and that said agent or representative is H. P. Schultz and Son, New Baden, Texas; that plaintiff resided in the county of this suit at all times material to this cause of action, and he also relies on Sec. 23 of Art. 1995, V.A.C.S., which facts authorize venue of this suit in Robertson County, Texas.

■ Appellant went to trial on its plea of privilege. It did not file, subject to its plea of privilege, any exceptions to plaintiff's original petition nor to the controverting affidavit. In the absence of special exceptions to the petition or the controverting affidavit, each will be liberally construed in the pleader's favor. See Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, points 1 and 2, 141 A.L.R. 50. See also Dr. Pepper Co. v. Dr. Pepper Bottling Co. of Gonzales, Tex.Civ.App., 297 S.W.2d 741, point 1, at page 747; Ladner v. Reliance Corp., Tex., 293 S.W.2d 758.

Sec. 9a of Art. 1995, as amended Acts 1953, 53rd Leg. p. 390, chap. 107, provides as follows:

"9a. Negligence.—A suit based upon negligence per se, negligence at common law or any form of negligence, active or passive, may be brought in the county where the act or omission of negligence occurred or in the county where the defendant has his domicile. The venue facts necessary for plaintiff to. establish by the preponderance of the evidence to sustain venue in a county other than the county of defendant's residence are:

"1. That an act or omission of negligence occurred in the county where suit was filed.

"2. That such act or omission was that of the defendant, in person, or that of his servant, agent or representative acting within the scope of his employment.

"3. That such negligence was a proximate cause of plaintiff's injuries."

Sec. 23 of Art. 1995, V.A.C.S., provides in part as follows:

"Suits against a private corporation, association, or joint stock company may be brought in the county in which its principal office is situated; * * * or in the county in which the plaintiff resided at the time the cause of action or part thereof arose, provided such corporation, association or company has an agency or representative in such county." (Remainder not applicable).

Appellant's points 1, 2 and 14 are substantially as follows: (1) The undisputed evidence shows that the agreement between the appellant and appellee was that the appellant was to finance and furnish credit to the appellee to purchase and raise turkeys, and the trial court erred in finding appellant purchased turkeys and supplied feed for appellee; (2) the undisputed evidence shows that appellant furnished credit upon the application of the appellee, all of which originated in Tarrant County, Texas, and was repaid in said county, and the trial court erred in finding the contract between the parties was made in Robertson County, Texas; and (14) where the parties have by written contract designated the county wherein the contract is to be performed, exceptions 9a and 23 to venue under Art. 1995, V.A.C.S., are not applicable, having been waived by the terms of the agreement, and where the evidence shows the contract was to be performed in Tarrant County, Texas, it was error for the trial court to overrule appellant's plea of privilege to be sued in the county designated in the contract. We overrule each of the foregoing points for reasons which we shall hereafter briefly state.

■ First of all, we have read the entire testimony very carefully and the exhibits and it is our view that the record discloses that this contract originated through an official of the appellant acting as such and through its agent Schultz, who was shown to be a Notary Public in and for Robertson County and acting in such capacity during the year of 1955, the year the contract was made. Art. 5949, Sec. 2, V.A.C.S., provides: "To be eligible for appointment as Notary Public for any county, a person shall be a citizen of this state and at least twenty-one (21) years of age, and a resident of the county for

which he is appointed * * *." It was within the province of the trial judge, who was the trier of the facts, to weigh all of the evidence and to decide what credence should be given to the whole or any part of the testimony of each witness, and he was the judge not only of the facts proved but of the inferences to be drawn therefrom, provided such inferences were not unreasonable. This rule is found in Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, point 6, at page 199. That is to say, this entire plan was initiated by conference between the appellee and McCarthy, an official of appellant, and Schultz, agent of appellant, in Robertson County, Texas, and the entire plan and scheme was disclosed to appellee as to what he should do and to whom he should look for performance of this contract. This contract was to a large extent verbal. The parties agreed as to the turkeys that were to be purchased and how they were to be purchased and after delivery was made of the turkeys appellee would go to the office of the agent Schultz and there execute a purchase money note for such purchase. It is true that these notes were made payable to Universal Mills at its office in Ft. Worth, Texas, and there is no dispute about that. As we understand the record, the feed for the turkeys was ordered through agent Schultz and the feed was shipped to the agent and he delivered the feed to appellee's farm and when delivery of each shipment was complete the appellee would report to Schultz' office and execute a purchase money note for the feed. As we understand the record, in the event there was any complaint about the feed or any trouble with the turkeys, appellee was to report the matter to Schultz and to Mr. Wood, who was more or less a district representative, and Schultz was preferable because he was available at his office in New Baden. After a careful review of the record, we are of the view that the evidence tendered on the hearing is sufficient to support a prima facie case of negligence as against appellant on the feed furnished to appellee, as well as on the issue that the cause of action, or a part thereof, arose in Robertson County, Texas. We realize there is a clear distinction to be drawn between the venue facts and those necessary to establish a right of recovery on the merits, but, as we have stated, we are of the view that the evidence is sufficient to sustain a prima facie case against appellant on the venue facts. See Central Motor Co. v. Roberson, Tex.Civ.App., 139 S.W.2d 287, and cases there cited. See also McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W. 2d 442, points 18 and 19, at page 448. Perhaps we should say that appellant tendered no testimony contradicting the story that appellee related as to the time and manner in which this entire transaction was first begun and carried to completion. For statement of the rule see Farmers' Guaranty State Bank v. Burrus Mill & Elevator Co., Tex.Civ.App., 207 S.W. 400, point 1, at page 403. See also 16 Tex.Dig., Evidence, for collation of authorities; also 2 Tex.Jur. 519.

Appellant in its brief says: "The appellant contends that the contract was made in Tarrant County, Texas, and was performable in Tarrant County, Texas, under the terms of the written agreement." We certainly cannot agree with this contention. Appellant knew that it was dealing with appellee, who was a resident citizen of Robertson County, Texas. It knew that the turkeys were to be purchased by appellee and the turkeys would be shipped and delivered to appellee in Robertson County, Texas; that from time to time appellee would have to have feed for the turkeys and this feed was to be purchased from appellant and shipped to appellant's agent in Robertson County and delivered by said agent to appellee at his farm. The fact that the application for credit shows that appellee was to execute notes payable to appellant at its office in Fort Worth, Texas, is only a part of the contract between appellant and appellee. Appellant executed the verbal part of the contract by shipping its feed to its agent in Robertson County and having its agent deliver the feed to appellee, and we think this rec-

ord so shows without dispute. The fact that a part of the contract was performed at appellant's office in Fort Worth, Texas, does not contradict the verbal contract that a part was performable and was performed in Robertson County, and we think the whole scheme and plan for the contract originated in Robertson County, Texas, and the record in this respect is without dispute.

Going back to the testimony of appellee we quote:

"Q. * * * and this plan you had with Mr. McCarthy was based on growing turkeys in Robertson County, Texas * * *. A. Yes, sir.

"Q. Going back on that plan that Mr. McCarthy had on financing the purchase of the flock and the supplying of the feed, who did he say was to supply the feed? A. Mr. Schultz.

"Q. Were you to buy from Mr. Schultz or were you to buy from the Universal Mills? A. Buy from the Universal Mills through Mr. Schultz.

"Q. Did you from time to time call on Mr. Schultz to see if he had a statement of what you owed Universal Mills? A. Yes, sir. * * *

"Q. Now you signed all those notes (for feed)? A. Yes, sir.

"Q. Were any of those notes payable to H. P. Schultz & Sons? A. I don't believe they were.

"Q. They were all payable to Universal Mills? A. Yes, sir."

Hubert Corn testified in part as follows:

"A. H. P. Schultz and Clem Woods was there.

"Q. How did he introduce those to the group, Mr. Corn? A. As the Mill's representatives.

"Q. Your answer to that was what, Mr. Corn? A. H. P. Schultz and Clem Woods was the Mill's representatives down here * * *.

"A. He said, 'Mr. Schultz will be here at all times. If you all get into trouble, see him and he will get in touch with Clem Woods. Clem Woods has eight or ten counties and he will not be available every day like H. P. Schultz will.'"

Appellee also testified, in part, as follows:

"Q. Did Mr. McCarthy make any statement about whether they had a man in this field or not, whether Universal Mills had a man in the field? A. Yes, sir, he did.

"Q. What did he say about that? Just tell what was said. A. He said in case we ran into trouble to get in touch with Mr. Schultz, as we could not get in touch with Clem Woods always."

In appellee's brief we find this statement:

"All of the evidence in this matter shows that the appellee purchased the feed from Universal Mills. For such feed he became indebted to Universal Mills by the execution of promissory delivery notes, executed at the time, and respective times, of the delivery of their feed to him by their agent, H. P. Schultz.

"Under appellant's own contention, had H. P. Schultz & Son been a dealer instead of an agent they would have bought the feed from Universal Mills to resell the same. Had H. P. Schultz & Son bought the feed from Universal Mills and resold the same to appellee herein, appellee would have been indebted to H. P. Schultz & Son, instead of to Universal Mills."

We are in accord with this view.

Appellant's 8th and 9th points are:

"Under the provisions of the Texas Rules of Civil Procedure 97(a), a defendant is required to raise all counter claims arising out of the transaction or occurrence that is the subject matter

of the opposing party's claim, and the failure of the defendant to set out such claims is a complete waiver, and the appellee, in failing to plead his counter claims in the suit filed in Tarrant County, Texas, waived the same, and has no cause of action in a subsequent suit against the appellant.

"9. The undisputed evidence shows that the parties agreed that all matters in dispute were settled by the dismissal with prejudice of the suit filed by the appellant in Tarrant County, Texas, and the appellee in this case did not show a cause of action against the appellant, and the trial court erred in finding that the settlement and dismissal of the suit in Tarrant County, Texas, was not a bar to the appellee in filing a future suit for damages."

We have previously pointed out that appellant went to trial on its plea of privilege and that it filed no exceptions to appellee's controverting affidavit, nor, subject to its plea of privilege, did it file a plea of res adjudicata. Appellant wholly failed to tender an issue of settlement in its behalf by a plea of res adjudicata; however, it did, without objection, tender in evidence the original answer filed by appellee to the cause of action filed against appellee in the District Court of Tarrant County, cause numbered 20840–C. We quote the pertinent parts of the answer filed by appellee in the above cause:

"Now comes the defendant and denies each and every, all and singular, the allegations in plaintiff's original petition; and of this he puts himself upon the country.

"Wherefore, he prays judgment that plaintiff take nothing and that this defendant go hence with his costs without day."

In addition thereto, appellant, without objection, tendered in evidence the order of dismissal disposing of the above cause. We quote the pertinent parts:

"On this the 10th day of September, 1956, came on to be heard the above entitled and numbered cause and both parties having appeared by their attorneys, and it appearing to the court that all matters in dispute between the parties in this cause have been settled and there was no longer any necessity for the prosecution of this case, and the court being of the opinion that same should be dismissed:

"It is therefore ordered, adjudged and decreed that the above entitled and numbered cause wherein Universal Mills is plaintiff and Gilfert Mauk is defendant, be dismissed with prejudice, and that all costs in said case shall be taxed against defendant, for which let execution issue."

However, appellee did tender in evidence the testimony of Hon. W. S. Barron, one of the attorneys in this cause and one of the attorneys in the Fort Worth suit, who testified in part:

"Q. Under what circumstances, Mr. Barron, was disposition made of that case, and will you relate that circumstance in your own words. A. Mr. Yezak and I went to Mr. Wallace's office in Fort Worth and told him our mission, that we were the attorneys of record in that case and we wanted to see about settling it, and in talking just a brief time with reference to that, Mr. Wallace said that he would get in touch with his client. Mr. Yezak and I went into another office of Mr. Wallace's while he talked to his client over the phone, and he came in—Mr. Wallace came in—after the phone conversation (we presume that it was a phone conversation) and said that they would settle the nine hundred and ten dollar suit, plus interest and attorney's fees and so forth, for seven hundred dollars, and I think right at that time we told him that would be all right, and Mr. Wallace said, 'There has been something said about a suit here for the

loss of turkeys, and my client does not want any more suits,' and I made the statement to him that we would not agree not to bring a suit for damages. I think that was my exact words, and he said, 'Well, I don't think they want another suit,' and I told Mr. Wallace —or Mr. Wallace suggested—one of the two—that he would have to go back and talk to his client before he could agree to settle for the seven hundred dollars, and he went back in his office and came back and said that they would take the seven hundred dollars, and I believe maybe the expression was used that they would cross the bridge about the damage suit when we got to it. I think, in substance, that's what it was.

"Mr. Russ: That's all.

"Mr. Wallace: That's the story."

In addition to the foregoing, appellee tendered in evidence motion filed by appellant's attorney to dismiss the cause in the Fort Worth court. Omitting the formal parts, the motion said: "Comes now the plaintiff, Universal Mills, and moves the court that it dismiss the above entitled and numbered cause for the reason that all matters in dispute in said cause have been adjusted between the parties hereto and there is no longer any necessity to prosecute this case. Signed: Fred C. Wallace, Attorney for Plaintiff."

█ As we understand the court's findings of fact, the court's 11th finding has in effect expressly found that appellee did not agree or waive his right to bring a suit for damages here alleged, and has in effect found that the order of dismissal did not settle the controversy between the parties as to appellee's right to maintain a suit against appellant for damages. We think the evidence tendered by the Hon. W. S. Barron in this behalf is sufficient to sustain the court in this behalf. Moreover, as we understand, the comment made by attorney for appellant at the close of Judge Barron's testimony is likewise suffi-

cient to sustain the court's finding. However, we are of the further view that if the plea of settlement or a plea of res adjudicata had been properly presented by pleading, such plea would go to the merits of the case and could not be considered as a part of the venue facts. Our view in this behalf is grounded on the decision of our Supreme Court in Farmers' Seed & Gin Co. v. Brooks, 125 Tex. 234, 81 S.W.2d 675, where the court said substantially that a trial upon a plea of privilege is to determine whether complaining defendant is suable on the transaction involved where plaintiff filed the suit; that the trial on the merits is to determine defendant's liability on the transaction. Our Supreme Court has never departed from this distinction. We see no conflict in the rule stated by our Supreme Court in the above case and the rule stated by it in Victoria Bank & Trust Co. v. Monteith, 138 Tex. 216, 158 S.W.2d 63. That is to say, whether appellee had a cause of action for damages against appellant that arose in Robertson County is a matter to be decided on the hearing on the plea of privilege. On the other hand, whether the appellee settled such cause of action by his conduct in the Fort Worth case goes to the merits and is not available to appellant as a defense on hearing of the plea of privilege. See also Carraway v. Carraway, Tex.Civ.App., 302 S.W.2d 181, points 4 and 5, at page 185.

We have considered each of the other assignments and we are of the view that each of them is without merit and each is overruled.

█ As a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3–B Tex.Jur. pp. 370 and 372. (This general rule also applies to cases tried without the aid of a jury.) There is another general rule to the effect that "the rule is well settled that the

judgment of a trial court will not be set aside if there is any evidence of a probative nature to support it and that a court of civil appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings." See Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972, 977; Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286. See also cases collated under 4 Tex.Dig., Appeal & Error, See also Burrus Mills, Inc., v. Phillips, Tex.Civ.App., 260 S.W.2d 427, 430 (no writ history).

It is our view that the evidence tendered is sufficient to support each of the court's findings of fact and that such findings are not against the great weight and preponderance of the evidence under the doctrine announced in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

Since the merits of the case are not before us, we express no opinion thereon as to the legal effect of the agreement between the parties with reference to the settlement in the Fort Worth lawsuit.

Seeing no reversible error, the judgment of the trial court is affirmed.